# United States Court of Appeals

## For the First Circuit

_____

No. 01-2251

MEDCHEM (P.R.), INC.,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

_____

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. David Laro, U.S. Tax Court Judge]

_____

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

_____

David A. Hickerson with whom Lisa R. Fine and Weil, Gotshal &
Manges, LLP were on brief for appellant.

A. Duane Webber and Baker & McKenzie on brief for Electronic
Arts Puerto Rico, Inc., amicus curiae.

David English Carmack, Attorney, Tax Division, Department of
Justice, with whom Eileen J. O'Connor, Assistant Attorney General,
and Kenneth W. Rosenberg, Attorney, Tax Division, Department of
Justice, were on brief for appellee.

_____

July 10, 2002

_____

**LYNCH**, **Circuit Judge**.    This tax case requires interpretation of the Internal Revenue Code's Puerto Rico and Possession Tax Credit provision, 26 U.S.C. § 936 (2000), which permits a domestic corporation to elect a possession tax credit if it meets certain conditions, id. § 936(a).  The condition on which this case turns is that 75% or more of the gross income of the corporation for the three preceding years must be "derived from the active conduct of a trade or business within a possession of the United States."  Id. § 936(a)(2)(B).[1]

The taxpayer, MedChem (P.R.), Inc. ("M-PR"), contends that it meets this "active conduct of a trade or business" requirement; the Tax Court and the Commissioner of Internal Revenue disagree.  This issue appears to be one of first impression at the circuit level.

The particular tax credit codified at § 936 was added by the Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976) (codified in scattered sections of 26 U.S.C.), although it has its roots in legislation from the 1920s, see Revenue Act of 1921, Pub. L. No. 67-98, § 262, 42 Stat. 227, 271 (1921).  The government tells us that the tax credit is in the process of being phased out.  See 26 U.S.C. § 936(j).  This case has, in the interim, consequences for domestic corporations involved in

---

[1]    Section 936(a)(2)'s other condition is that at least 80% of the corporation's gross income for the three-year period immediately preceding the close of the tax year must be "derived from sources within a possession of the United States."  26 U.S.C. § 936(a)(2)(A).  The parties agree that MedChem (P.R.) meets this requirement.

business activity in Puerto Rico[2] and certain other possessions. Unfortunately, there are no promulgated regulations under § 936(a) and domestic corporations have been forced to make business arrangements in U.S. possessions without the prior guidance such regulations might provide.

Based primarily on § 936's text, understood in the context of the legislative history, we conclude that M-PR has failed to meet the "active conduct of a trade or business" requirement and, accordingly, we affirm the Tax Court's judgment. We do so without adopting the Tax Court's proposed test for what constitutes the active conduct of a trade or business in a U.S. possession for purposes of § 936(a).

**I.**

The facts in this case are not in dispute, MedChem (P.R.), Inc. v. Comm'r, 116 T.C. 308, 310 (2001); see generally Tax Ct. R. 122, although M-PR contests the inferences the Tax Court drew from the stipulated record. M-PR is the taxpayer claiming to qualify for the possessions tax credit.

M-PR's identity has gone through several transformations. M-PR was incorporated in Delaware on December 8, 1987, as MedChem Puerto Rico, Inc. A couple of weeks later, on December 22, MedChem Puerto Rico, Inc. changed its name to BioChem Products, Inc. Then, on March 1, 1992, BioChem Products, Inc. changed its state of

---

[2] Puerto Rico is a Commonwealth; it is explicitly within the term "possession" for purposes of § 936. 26 U.S.C. § 936(d)(1) ("The term 'possession of the United States' includes the Commonwealth of Puerto Rico . . . .").

-3-

incorporation to Massachusetts and, on November 25, 1992, changed its name to MedChem P.R., Inc.  M-PR and all of its predecessors -- all of which we will refer to as M-PR -- were at all times wholly owned subsidiaries of MedChem Products, Inc. ("M-USA").  M-USA is a Massachusetts corporation with its principal place of business in Woburn, Massachusetts.  Following the tax years at issue in this case,[3] M-USA succeeded M-PR through a merger of M-PR into M-USA.

The IRS found a deficiency of $815,196[4] in M-PR's federal income tax paid for the tax year ending August 31, 1992, and a deficiency of $1,705,019 in M-USA's tax payments for the same period.  In consolidated cases in the Tax Court, M-USA, as successor by merger to M-PR, contested both of these claims of deficiency.  MedChem, 116 T.C. at 309.  It is the $815,196 liability that is at issue here.

During the relevant three-year period -- that is, during each of M-PR's taxable years ending on August 31, 1990-92 -- all of M-PR's reported income was "intangible property income," see 26 U.S.C. § 936(h)(3), attributable to the sale of Avitene, a blood-

_____

[3]    When we refer to the "tax years at issue" or the "subject years of this case," we mean the three-year period made relevant by § 936(a)(2).  That is, the three-year period "immediately preceding the close of the taxable year."  Here, because the alleged deficiency occurred for the tax year ending August 31, 1992, the three-year period runs from September 1, 1989, through August 31, 1992.

[4]    The Tax Court states that the deficiency was $815,196.  MedChem, 116 T.C. at 309.  In contrast, both parties, at various points in their briefs, state that the sum is $815,916.  The Notice of Deficiency uses both figures.  We assume that $815,196 is the correct figure.

clotting drug manufactured by Alcon Puerto Rico, Inc. ("A-PR"), an unrelated company.

On December 18, 1987, ten days after M-PR was incorporated, A-PR along with Alcon Pharmaceuticals, Ltd. and Alcon Laboratories, Inc. (collectively "Alcon entities") sold the Avitene portion of their business to M-PR and M-USA. The Alcon entities sold the equipment, raw materials, technology, and other assets associated with Avitene's manufacturing. M-USA acquired the receivables, non-competition agreements, goodwill, contract rights, records, patents and related know-how, trademarks, and Food and Drug Administration approvals. M-PR acquired receivables, inventory, and title to the machinery and equipment located within A-PR's manufacturing facility in Humacao, Puerto Rico. Those assets did not include A-PR's Avitene manufacturing facility in Humacao.

Before the acquisition, A-PR had been the manufacturer of Avitene. M-USA had nothing to do with the drug. Until ten days prior to the acquisition, M-PR did not exist. As part of the sale, A-PR agreed to continue manufacturing Avitene for M-PR using A-PR's own facility and labor and M-PR's recently-acquired raw materials and equipment. A-PR also used the technology acquired by M-USA. M-PR held title to the in-process and finished Avitene. A-PR shipped finished Avitene from its facility to M-USA, and title passed to M-USA, the purchaser. A-PR was solely responsible for any issues that arose until the finished product was delivered to a carrier for shipment to M-USA. In return, A-PR sent its invoices

for its manufacturing services directly to M-USA, which paid, from M-PR's account, a price equal to the manufacturing cost plus 10%. The primary change effected by the 1987 sale was that certain assets were held in the name of either M-PR or its parent, M-USA.

The reason M-PR entered into the processing agreement with A-PR, in which A-PR manufactured Avitene for M-PR using M-PR's raw materials and equipment, was that M-PR needed to ensure a steady supply of Avitene until it built its own manufacturing facility in Puerto Rico. As it turns out, M-PR later abandoned its plan to construct its own Avitene facility in Puerto Rico.

During much of the relevant three-year period, M-PR had no employees. Its one employee, Mr. Perez, was a former A-PR employee. He worked for M-PR from March 1988 to June 1990 out of a one-room office that M-PR maintained. Mr. Perez spent much of his time planning M-PR's transition to its own Avitene manufacturing facility. M-PR also paid three independent contractors to assist Mr. Perez. M-PR treated the independent contractors as nonemployees for payroll and tax purposes. M-USA and A-PR employed the individuals, other than Mr. Perez and the independent contractors, associated with the Avitene manufacturing and sales business.

At the time of the 1987 processing agreement, M-PR and M-USA had hoped to establish their own manufacturing facility in Puerto Rico. M-PR purchased land in Puerto Rico, on which it planned to build its own Avitene manufacturing facility. In early 1990 M-USA suffered financial reverses causing it to lay off a

third of its workforce and to default on $10 million in debt. As a result, M-PR suspended its plans to construct a manufacturing facility in Puerto Rico. M-PR then wrote off its capital expenditures that had been made on the new facility and closed its Puerto Rico office. When the office closed, Perez transferred M-PR's business records to A-PR and M-USA. As of July 1, 1990, all M-PR checks were issued by M-USA from M-USA's Woburn, Massachusetts office.

In early 1990 M-USA decided to move the manufacturing equipment and processes from A-PR's Humacao facility to M-USA's facility in Woburn. Significant elements of the equipment were moved from Humacao to Woburn by June 1990 and, by January 1991, all of the manufacturing equipment necessary to perform the first phase of the manufacturing process had been moved to Woburn. In October 1992, first-phase Avitene production commenced in Woburn. By April 1994, M-USA had substantially completed the construction, in Woburn, of its Avitene finished goods manufacturing facility.

**II.**

For its tax year ending August 31, 1992, M-PR claimed a tax credit under § 936. The Commissioner determined that M-PR's Avitene income was not "derived from the active conduct of a trade or business" within a possession as § 936(a)(2)(B) requires. Accordingly, the Commissioner issued a notice of deficiency in the amount of $815,196.

M-USA, as successor by merger to M-PR, contested the asserted deficiency. On June 27, 2001, the Tax Court entered its

final decision, finding that M-PR was deficient, in the sum of $815,196, in its federal income tax payments. The Tax Court concluded that M-PR did not meet § 936(a)(2)(B)'s "active conduct of a trade or business within a possession" requirement. MedChem, 116 T.C. at 309, 328-29. The Tax Court held that

> for purposes of section 936(a), a taxpayer actively conducts a trade or business in a U.S. possession only if it participates regularly, continually, extensively, and actively in the management and operation of its profit-motivated activity in that possession. . . . [F]or the purpose of this participation requirement, the services underlying a manufacturing contract may be imputed to a taxpayer only to the extent that the performance of those services is adequately supervised by the taxpayers's own employees.

Id. at 336-37.

The Tax Court concluded that M-PR did not meet this test. Id. at 337. It concluded that A-PR and M-USA (located in a mainland U.S. facility) performed, directed, and controlled all of the business activities related to the manufacture of Avitene. Id. at 339. The Tax Court found that, under the processing agreement, A-PR used its own personnel to manufacture, test, and package the Avitene at its Humacao facility. Id. at 317. A-PR employees performed all of the tasks required in the manufacturing process, including the supervision of that manufacturing. Id. at 317, 339. It was M-USA which distributed, marketed, and sold the drug in the United States. Id. at 339. Indeed, the processing agreement prohibited M-PR from taking a managerial role in the manufacturing process. Id. at 346. Any risks associated with M-PR's activities appear to be minimal, as M-USA had guaranteed payment of any debt, and performance of any of M-PR's obligations, arising from the

asset purchase agreements. Id. at 316. M-USA consistently reported, including to the FDA and to the SEC, that the unrelated entity, A-PR, was the drug's manufacturer. Id. This information was also contained on the labels of the drugs. Id. at 315-16.

M-PR appeals the Tax Court's decision.

## III.

## A. Standard of Review

This court reviews the Tax Court's decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1) (2000); see also Silverman v. Comm'r, 86 F.3d 260, 261 (1st Cir. 1996). Our standard of review is two-fold. We review de novo the Tax Court's statutory and other legal interpretations. Alexander v. IRS, 72 F.3d 938, 941 (1st Cir. 1995). We review its factual findings, including those based on inferences from stipulated facts, for clear error. Manzoli v. Comm'r, 904 F.2d 101, 103 (1st Cir. 1990). To the extent that M-PR is making a clear error argument with respect to the Tax Court's factual findings, we reject the argument.

There are no Treasury Department regulations interpreting § 936(a),[5] nor is the term "active conduct of a trade or business" defined for purposes of § 936. There are, however, some guides to

_____

[5] Had the Treasury Department promulgated a regulation interpreting § 936(a), we would have been required, absent contradictory statutory language, to defer to a reasonable interpretation. Kikalos v. Comm'r, 190 F.3d 791, 795-96 (7th Cir. 1999); Snowa v. Comm'r, 123 F.3d 190, 195-96 (4th Cir. 1997).

statutory interpretation, which assist us. "It is well established in the tax law that an [IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes] is entitled to a legal presumption of correctness -- a presumption that can help the Government prove its case against a taxpayer in court." United States v. Fior D'Italia, Inc., No. 01-463, 2002 U.S. LEXIS 4418, at *9-10 (U.S. June 17, 2002). Furthermore, income tax deductions and credits are matters of legislative grace; the taxpayer bears the burden of proving entitlement to any deduction or credit claimed. Indopco, Inc. v. Comm'r, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Norfolk S. Corp. v. Comm'r, 104 T.C. 13, 36 (investment tax credit), supplemented by 104 T.C. 417 (1995), aff'd, 140 F.3d 240 (4th Cir. 1998). Moreover, a deduction or credit should be allowed only where there is "clear provision therefor." New Colonial Ice Co., 292 U.S. at 440; see also Helvering v. Inter-Mountain Life Ins. Co., 294 U.S. 686, 689 (1935) (stating that "[d]eductions are allowed only when plainly authorized").[6]

---

[6]    We are not persuaded by M-PR's contention that, if § 936 is ambiguous, then this court should strictly construe it against the government. Here, we are interpreting a provision permitting a tax credit, not a provision levying a tax. The Supreme Court has stated that in the context of a tax deduction, it is "not impressed by the argument that . . . all doubts should be resolved in favor of the taxpayer." White v. United States, 305 U.S. 281, 292 (1938); see also United States v. Stewart, 311 U.S. 60, 71 (1940) (stating that "those who seek an exemption from a tax must rest it on more than a doubt or ambiguity"); Inter-Mountain Life Ins. Co., 294 U.S. at 689-90 (holding that deductions must be plainly authorized, not derived from ambiguities). Rather, it is the duty of a court to determine "what [the] construction [of a statute] fairly should be." White, 305 U.S. at 292. M-PR's argument would be more appropriate were this a case involving a statute imposing

## B. Positions of the Parties

The parties have presented the court with different interpretations of the meaning of § 936(a). The Tax Court has, in its ruling, left each side dissatisfied. Both sides' interpretations diverge from the Tax Court's, although the government's position is much closer to the Tax Court's conclusion.

The Tax Court rejected M-PR's statutory plain meaning argument. MedChem, 116 T.C. at 328-29. Instead, it crafted a test that, in the absence of a statutory or regulatory definition of "active conduct of a trade or business" for purposes of § 936(a), looks to regulations defining the phrase as it is used elsewhere in the code, bearing in mind the section's legislative intent, id. at 330-33. Applying this test, the Tax Court rejected interpretations more helpful to the taxpayer, provided in other regulations, see, e.g., 26 C.F.R. § 1.936-5(c) (2001). The applicable test, the Tax Court held, was whether the taxpayer "participates regularly, continually, extensively, and actively in the management and operation of its profit-motivated activity in that possession." MedChem, 116 T.C. at 336. It held that to impute a contractor's activities to the taxpayer, the taxpayer had to "adequately supervise[]" the provision of these services with its own employees. Id. at 337. The Tax Court found the facts about M-PR's relationship with the contract manufacturer inadequate under its

---

a tax, rather than a statute permitting a tax credit.

-11-

newly crafted test, and thus found that M-PR is not entitled to the credit.  Id. at 337-43.

The Commissioner rejects M-PR's "plain meaning" reading of the statute and generally rejects the proposition that use of contract manufacturers in possessions is ever sufficient to qualify for the § 936(a) tax credit, but allows for rare exceptions where the taxpayer corporation is very heavily involved in the operation and management of the contract manufacturer.  The Commissioner seeks affirmance of the Tax Court's result, but at oral argument protested the Tax Court's test, which is more beneficial to taxpayers than the IRS's proposed test for what constitutes the active conduct of a trade of business.  The IRS proposes that outsourced manufacturing may never (well, hardly ever) qualify for the tax credit.  Only in rare instances, when the taxpayer is heavily involved in the management and control of operations of a contract manufacturer, says the IRS, might it qualify.

The taxpayer, M-PR, on the other hand, argues that the statute's plain meaning does not preclude tax credits to taxpayers who use contract manufacturers located in the possessions and that, if more were required, it has, on the facts, provided the requisite more.  M-PR says the Tax Court is wrong in its statutory interpretation and in its choice of test.  M-PR asserts that the Tax Court's test is inconsistent with regulations applicable to other parts of § 936.

We affirm the denial of the credit and the finding of deficiency.  In doing so, we assess and reject the taxpayer's plain

meaning arguments, look to the Act's legislative history for further guidance regarding congressional intent in enacting § 936, and compare the section at issue with the now-repealed Western Hemisphere Trade Corporation provisions of the Internal Revenue Code of 1954. We conclude that, on the facts presented, M-PR does not fall within the language of the statute or Congress's intent. We do so without adopting the Tax Court's proposed test.

## C. The Statute and Plain Meaning

Before analyzing the statute, we think it helpful to understand the context in which the statutory interpretation question arises. "Possessions corporations . . . are U.S.-chartered companies that are effectively exempt under section 936 of the Internal Revenue Code from Federal tax on business income and qualified passive investment income from Puerto Rico and certain other U.S. possessions." Dep't of the Treasury, The Operation and Effect of the Possessions Corporation System of Taxation, Sixth Report 1 (1989) (footnotes omitted).

The Treasury Department has described the general operation of the possessions corporation tax system:

> The possessions corporation system of taxation is a set of rules under which a U.S. corporation deriving qualifying income from possessions and Puerto Rico pays no income tax to the United States. As a U.S. corporation, a possessions corporation is subject to federal tax on its worldwide income. However, a special credit available under section 936 fully offsets the federal tax on income from a trade or business in Puerto Rico and from qualified possession source investment income (QPSII). A U.S. parent corporation can, in turn, offset dividends received from a wholly owned 936 subsidiary with a 100 percent dividends-received

-13-

deduction, which frees the dividend income from federal tax.

Id. at 5.

With this context, we turn to the statutory language. The code section at issue provides, in relevant part:

> § 936. Puerto Rico and possession tax credit
> (a) Allowance of credit
> (1) In general
> Except as otherwise provided in this section, if a domestic corporation elects the application of this section and if the conditions of both subparagraph (A) and subparagraph (B) of paragraph (2) are satisfied, there shall be allowed as a credit against the tax imposed by this chapter an amount equal to the portion of the tax which is attributable to the sum of --
>> (A) the taxable income, from sources without the United States, from --
>>> (i) the active conduct of a trade or business within a possession of the United States, or
>>> (ii) the sale or exchange of substantially all of the assets used by the taxpayer in the active conduct of such trade or business, and
>> (B) the qualified possession source investment income.
> (2) Conditions which must be satisfied
> The conditions referred to in paragraph (1) are:
>> (A) 3-year period
>> If 80 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may be applicable) was derived from sources within a possession of the United States (determined without regard to section 904(f)); and
>> (B) Trade or business
>> If 75 percent or more of the gross income of such domestic corporation for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States.

26 U.S.C. § 936(a)(1)-(2). A separate subsection of § 936 governs the tax treatment of possessions corporations' intangible property

-14-

income.  26 U.S.C. § 936(h).  The Treasury Department has issued regulations under § 936(h), see 26 C.F.R. §§ 1.936-4 to -7 (2001), although not under § 936(a).  It is the § 936(a) "derived from the active conduct of a trade or business" language that is at issue here.  26 U.S.C. § 936(a)(2)(B).

M-PR argues that § 936(a) "requires only that the taxpayer derive its income from an active business rather than a passive investment."  Its argument is really two-fold: first, that "active conduct" means all non-passive conduct; second, that the taxpayer corporation need only derive its income from some non-passive source, meaning that the taxpayer can qualify by deriving its income from the active conduct of a third party rather than from the taxpayer's own active conduct.  This interpretation, if accepted, would mean that a domestic corporation that gets its income from the sale of a pharmaceutical product manufactured by a contract manufacturer in Puerto Rico, as here, would qualify for the tax credit.  We deal with each argument in turn, rejecting both parts as contrary to the text of the statute.

First, M-PR's interpretation, construing income "derived from the active conduct of a trade or business" to mean income "derived from an active, rather than passive, business," renders the statutory term "active" surplusage. The phrase "active conduct of a trade or business" does not mean that all income derived from anything that is not a passive investment qualifies for the

-15-

credit.[7]  We accept the Commissioner's view that the phrase "conduct of a trade or business" alone, without the term "active," distinguishes section 936(a) income from passive investment income. M-PR's construction renders the term "active" redundant.  That is not a permissible form of interpretation.  E.g., New England Power & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equip. & Marine, Inc.), No. 01-2314, 2002 WL 1248226, at *4 (1st Cir. June 11, 2002) (stating that "[w]e assume each term was meant to have separate content in order to avoid redundancy").

Given that the statutory term "active" is not surplusage, we must determine what independent meaning it adds to the statutory phrase "active conduct."  Because "active" modifies "conduct," we conclude that "active conduct" means something more than simply a minimal level of involvement in the process of conducting a trade or business.  Not all conduct of a trade or business qualifies under § 936(a)(2)(B); only "active conduct" qualifies.  Because the "conduct of a trade or business" itself requires some level of activity, the adjective "active" must, in context, signify something more than a non-zero level of activity.

The Oxford English Dictionary's first definition of the noun "conduct" is "[t]he action of conducting or leading," and, as

_____

[7]     M-PR notes that the Commissioner has previously taken the position that the "active conduct" requirement is meant to distinguish between investment income and business income.  That proposition is different from the proposition M-PR urges here, which is that the "active conduct" requirement is met so long as the taxpayer derives income from any source not wholly passive.  To say that the "active conduct" requirement distinguishes investment income from business income is not to say that all income other than investment income meets the requirement.

-16-

the term relates to a business, it is defined as "[t]he action or manner of conducting, directing, managing, or carrying on (any business . . . etc.)." Oxford English Dictionary (2d ed. 1989), http://dictionary.oed.com.  Similarly, Webster's defines the noun "conduct" as "the act, manner, or process of carrying out . . . or carrying forward (as a business, government, or war)." Webster's Third New International Dictionary of the English Language Unabridged 473 (P.B. Gove et al. eds. 1993).  "Active," in turn, is generally defined as "[c]haracterized by action" and is defined in terms such as "[o]riginating or communicating action," "practical," "working, effective, having practical operation or results." Oxford English Dictionary, supra; see also Webster's Third New International Dictionary of the English Language Unabridged, supra, at 22 (defining "active" as "characterized by action rather than by contemplation or speculation").

The mere act, without more, of purchasing products that another unrelated entity has taken the action to manufacture, and reselling the products to others outside the possession, does not fit within the meaning of "active conduct of a trade or business." In such a case, it is the unrelated entity controlling and directing the manufacturing that is actively conducting the trade or business.

Here, the Tax Court was "not even able to find that M-P.R. had any meaningful business activity in Puerto Rico." MedChem, 116 T.C. at 337.  It found that M-PR's "involvement in Puerto Rico during the 3-year period failed even to qualify as a

-17-

trade or business in Puerto Rico," id. at 338, never mind as an actively conducted trade or business. It concluded that A-PR and M-USA, but not M-PR, directed and controlled "[a]ll of the business activities connected to Avitene," id., and that A-PR "performed every task required in the manufacturing process," without the ability of M-PR "to manage, direct, or control any part of the manufacturing process," id. at 339. These findings were not clearly erroneous. On these facts, we are confident in the conclusion that M-PR did not itself actively conduct a trade or business.

The remaining question is whether A-PR's manufacturing activities may be attributed to M-PR for the purposes of § 936(a). The answer to this question hinges on M-PR's second claim, that the statutory phrase requires only that the income "derived" by the taxpayer be from some third party engaged in the active conduct of a trade or business. We reject this claim as well. Both the Tax Court and the Commissioner interpret § 936(a) as requiring that the taxpayer, not someone else, be the entity engaged in the active conduct of a trade or business. We agree.

First, this reading is the most natural reading of the statutory requirement that at least 75% of the taxpayer's gross income during the relevant period be "derived from the active conduct of a trade or business within a possession of the United States." 26 U.S.C. § 936(a)(2)(B). M-PR correctly notes that Congress could have more explicitly said, "the active conduct by the taxpayer of a trade or business" and it did not. But Congress

might have concluded that the addition of the phrase would be redundant, given the preceding discussion and especially given that the taxpayer corporation is the only actor referenced in § 936(a)(1)-(2). Congress could also have said "the active conduct by the taxpayer or any contract manufacturer of a trade or business," which is M-PR's reading, and it did not. Viewed myopically, the statutory phrase is silent on whose "active conduct of a trade or business" it refers to, but, viewed in context, the best reading is that it means the taxpayer's own active conduct. Ambiguity in this instance does not assist M-PR because a deduction or credit should be allowed only where there is "clear provision therefor." New Colonial Ice Co., 292 U.S. at 440. M-PR has simply not met its burden of proving entitlement to the § 936 credit claimed.

To read the statute as requiring only that the income be derived from a third party's active conduct would eliminate the distinction between active conduct income and all other income, including passive investment income. Virtually all passive investment income, for example, is derived, somewhere down the chain, by some entity's active conduct of a trade or business.

Finally, as discussed below, the legislative history confirms Congress's intent to require the taxpayer claiming the credit to itself be engaged in the active conduct of a trade or business. If M-PR's interpretation were correct, then upon the 1976 enactment of § 936, see Tax Reform Act of 1976, Pub. L. No. 94-455, § 1051, 90 Stat. 1520, 1643-47 (1976) (current version at

-19-

26 U.S.C. § 936 (2000)), all domestic corporations that had contract manufacturers in Puerto Rico (and otherwise met the numerical requirements) would automatically have become eligible for the tax credit. This is, in our view, highly improbable on its face. It is particularly improbable given the legislative history discussed below.

## D. Legislative History and Western Hemisphere Trading Corporations

### 1. Legislative history.

As stated above, at issue in this case is the proper interpretation of § 936's "active conduct of a trade or business" language. Section 936 in general, and the "active conduct of a trade or business" language in particular, have their roots in much older legislation. Before analyzing the legislative history as it pertains to the meaning of the relevant statutory phrase, we describe § 936's predecessors.

Both § 936 and the basic structure of today's possessions corporation tax system have their genesis in a provision of the Revenue Act of 1921. See Revenue Act of 1921, Pub. L. No. 67-98, § 262, 42 Stat. 227, 271 (1921). The phrase we interpret -- "derived from the active conduct of a trade or business" -- first appeared in the Revenue Act of 1921, though in a slightly different context. Compare id. with 26 U.S.C. § 936(a)(2)(B). The 1921 Act exempted a domestic corporation from federal taxes on foreign-source income if, for the three years preceding the close of the taxable year, it derived at least 80% of its gross income from

sources within a possession and 50% or more of its gross income "from the active conduct of a trade or business" within the possessions. § 262, 42 Stat. at 271. Congress enacted this section of the 1921 Act to eliminate the competitive disadvantage that U.S. corporations were suffering as a result of double taxation of income earned outside the U.S. and to encourage U.S. business investments in U.S. possessions. See S. Rep. No. 67-275 (1921), reprinted in 1939-1 C.B. (pt. 2) 181, 187; see generally Coca-Cola Co. v. Comm'r, 106 T.C. 1, 21 (1996) (describing the 1921 Act and its progeny); N.H. Kaufman, Comment, Puerto Rico's Possessions Corporations: Do the TEFRA Amendments Go Too Far?, 1984 Wis. L. Rev. 531, 533-37 (same).

Congress carried forward, without material change, the 1921 Act's possessions corporation exemption into section 931 of the Internal Revenue Code of 1954. See Internal Revenue Code of 1954, Pub. L. No. 83-591, § 931, 68A Stat. 3, 291 (1954). Section 931 used the same language as the 1921 Act's section 262, requiring, among other things, that 50% or more of the corporation's gross income be "derived from the active conduct of a trade or business." § 931(a)(2), 68A Stat. at 291.[8] Section 931

---

[8] The 1954 Internal Revenue Code provided, in relevant part:

Sec. 931. Income From Sources Within Possessions of the United States.

(a) General Rule. -- In the case of citizens of the United States or domestic corporations, gross income means only gross income from sources within the United States if the conditions of both paragraph (1) and paragraph (2) are satisfied:

-21-

remained in effect without material change until the mid-1970s, when Congress enacted legislation approximating the current version of 26 U.S.C. § 936. See G.D. Searle & Co. v. Comm'r, 88 T.C. 252, 350-52 (1987) (describing the genesis of § 936).

Section 1051 of the 1976 Tax Reform Act added a new U.S. Code section, 26 U.S.C. § 936. See Tax Reform Act of 1976, Pub. L. No. 94-455, § 1051, 90 Stat. 1520, 1643-47 (1976) (current version at 26 U.S.C. § 936 (2000)). Section 936 partially replaced section 931, as it relates to Puerto Rico.[9] See id. The 1976 legislation

_____

(1) Three-year period. -- If 80 percent or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section) for the 3-year period immediately preceding the close of the taxable year . . . was derived from sources within a possession of the United States; and

(2) Trade or business. -- If --

(A) in the case of such corporation, 50 percent or more of its gross income (computed without the benefit of this section) for such period . . . was derived from the active conduct of a trade or business within a possession of the United States . . . .

§ 931, 68A Stat. at 291.

[9] Section 936 did not entirely replace section 931. The then-existing provision -- 26 U.S.C. § 931 -- was retained, but only for qualifying "individual citizens," as opposed to corporations. In addition, it was made inapplicable to Puerto Rico by defining "possession," for purposes of section 931, not to include Puerto Rico. § 1051(c), 90 Stat. at 1645. In the case of domestic corporations deriving the requisite income from Puerto Rico and deriving the requisite income from active conduct of a trade or business in Puerto Rico, the § 936 credit is available. See 26 U.S.C. § 936. In the case of qualifying U.S. individual citizens, the Puerto Rican source income exclusion is now contained in 26 U.S.C. § 933.

-22-

effected a number of revisions in prior law. To focus on the revision central to this case, the new § 936 transformed the old section 931 _exemption_ mechanism into a tax _credit_. The credit permits domestic corporations to offset U.S. taxes on income "derived from the active conduct of a trade or business" in Puerto Rico, if certain prerequisites are met. § 1051(b), 90 Stat. at 1644.[10] We rely on the Treasury Department's 1989 Report, which described the transition from the 1921 Act to the 1976 Act:

> The possessions corporation exemption remained unchanged until the Tax Reform Act of 1976. Many U.S. firms established plants in Puerto Rico after 1948, when Puerto Rico enacted a program of tax exemption for manufacturing firms. Before the 1976 Act was implemented, proponents of continued U.S. tax exemption argued that the possessions corporation system of taxation was needed to offset the U.S. minimum wage requirement, the requirement to use U.S. flag vessels in transporting goods to the United States, and other Federally imposed requirements that tended to reduce Puerto Rico's ability to compete with neighboring countries for U.S. investment.
>
> By enacting the Tax Reform Act of 1976, Congress wanted to leave undisturbed the tax exemption of earnings from a trade or business in Puerto Rico or from investments made with those earnings for Puerto Rican use. At the same time, Congress wished to end the exemption for passive income from funds invested in foreign capital markets and to hasten their repatriation if not used in the possession. . . .
>
> To continue promoting Puerto Rico's industrial development, the Tax Reform Act of 1976 therefore left intact the exemption for income derived by U.S.

---

[10] Since 1976, there have been many amendments to the possessions corporations taxation system in general and to § 936 in particular, including those imposed by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 (1982), and by the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (1986). We do not analyze these changes. The text of the provision we construe, 26 U.S.C. § 936(a)(2)(B), has remained unchanged since 1976, except that its 50% "trade or business" requirement is now a 75% requirement.

corporations from operations in a possession.  It also exempted from tax the dividends remitted by a possessions corporation to its U.S. parent.  To prevent the avoidance of tax on income invested in foreign countries by possessions corporations, however, the Tax Reform Act eliminated the exemption for income derived outside the possessions.  The changes in the tax treatment of possessions corporations were effected by removing possessions corporations from section 931 of the Internal Revenue Code and placing them into a newly created Code section 936.

The Operation and Effect of the Possessions Corporation System of

Taxation, supra, at 6.

As to the problem before us, the Treasury Report

described the effect of the change:

Change in the scope of and method of effecting the tax exemption.  Before 1976, a possessions corporation was exempt from U.S. tax on all income derived from sources outside the United States.  Under the Tax Reform Act of 1976, the exemption was limited to two kinds of income:

--      Income from the active conduct of a trade or business in a possession, or from the sale or exchange of substantially all of the assets used by the corporation in the active conduct of such trade or business; and

--      QPSII, which is non-business income derived from the possession in which the corporation has its trade or business and which is attributable to the investment of funds derived from such trade or business for use within the possession.

Rather than exempting the income from U.S. taxation, section 936 provides a credit equal to (and, therefore, fully offsetting) the U.S. tax on the income.  The section 936 credit is not available for other income earned by a possessions corporation. However, a regular foreign tax credit may be claimed for foreign (including possession) taxes paid or accrued with respect to income that does not qualify for the 936 credit.

Id. at 7 (footnote omitted).

-24-

The House and Senate Reports are virtually identical on the pertinent provision. See H.R. Rep. No. 94-658, at 253-60 (1975), reprinted in 1976 U.S.C.C.A.N. 2897, 3149-56; S. Rep. No. 94-938, at 277-84 (1976), reprinted in 1976 U.S.C.C.A.N. 3438, 3707-13. The Reports discuss the tax treatment of corporations conducting trade or business in possessions of the U.S. as well as issues arising under the now-repealed Western Hemisphere Trade Corporation provisions of the Internal Revenue Code of 1954, §§ 921-922, 68A Stat. at 290-91 (repealed in 1976 for taxable years after 1979). See H.R. Rep. No. 94-658 at 253-60; S. Rep. No. 94-938 at 277-84.

Describing the law as it existed prior to the enactment of the Tax Reform Act of 1976, the House and Senate Reports recite that

> [u]nder present law, corporations operating a trade or business in a possession of the United States are entitled to exclude from gross income all income from sources without the United States, including foreign source income earned outside of the possession in which they conduct business operations, if they meet two conditions.

H.R. Rep. No. 94-658 at 253-54 (emphasis added); see also S. Rep. No. 94-938 at 277. With this in mind, a new provision, 26 U.S.C. § 936, was added "for the tax treatment of U.S. corporations operating in Puerto Rico." H.R. Rep. No. 94-658 at 256 (emphasis added); see also S. Rep. No. 94-938 at 279. We think this language supports the Commissioner's view that the taxpayer must be the one actively conducting the trade or business.

-25-

As to the changes in the possessions tax credit legislation, Congress stated that it sought to "assist the U.S. possessions in obtaining employment-producing investments by U.S. corporations, while at the same time encouraging those corporations to bring back to the United States the earnings from these investments to the extent they cannot be reinvested productively in the possession." H.R. Rep. No. 94-658 at 255; see also S. Rep. No. 94-938 at 279 (using the same language). The congressional history reflects a dual intention to stimulate investment, both active and passive, in Puerto Rico and to encourage the growth of new jobs in Puerto Rico. H.R. Rep. No. 94-658 at 255; S. Rep. No. 94-938 at 279 (same). Those are related but not identical objectives. Congress's emphasis on the creation of new jobs by operating companies is also reflected by the fact that Congress mandated that the Department of the Treasury report to it periodically on the progress in meeting that goal. See H.R. Rep. No. 94-658 at 259 (stating that the Department of the Treasury's reports are to include, among other things, "an analysis of . . . the [provision's] effects on investment and employment in the possessions"); S. Rep. No. 94-938 at 282 (same).

Although the Department of the Treasury has not promulgated regulations under § 936(a), its reports provide data both on how Treasury has interpreted that section and on the context of the legislation. We look, in particular, to Treasury's 1989 Report. See The Operation and Effect of the Possessions Corporation System of Taxation, supra. The 1989 Report provides

-26-

insight into Treasury's interpretation of § 936. For example, the 1989 Report says "[b]y enacting section 936, Congress sought to assist Puerto Rico in obtaining employment-producing investments." Id. at 3; see also id. at 46 (same). Accordingly, Treasury matched "possessions corporations' U.S. income tax returns with payroll and employment data from the companies' federal unemployment insurance tax returns" to determine "whether this objective has been attained." Id. at 46. In particular, Treasury sought to measure the "direct employment associated with section 936 companies." Id.

For example, as of 1989, Puerto Rican business expansion had "been concentrated in four high-technology industries: chemicals (including pharmaceuticals), scientific instruments, electrical and electronic equipment, and machinery." Id. at 27. From 1970 to 1988, the chemical industry's earned income grew from 11% to 44% of total income originating in Puerto Rican manufacturing. Id. Nearly all of the investments in those industries were made by possessions corporations. Id. at 27-29. Indeed, in 1983, about 62% of the employees in the Puerto Rican manufacturing sector were employed by possessions corporations; this represents about 12% of Puerto Rico's total employment. Id. at 3. As the 1989 Treasury Department Report makes clear, most of the corporations that qualified to receive the possessions tax credit were manufacturing corporations. Id. at 31.

On the whole, the views on eligibility for the tax credit expressed both in the legislative history and in the Treasury Department's Report are more consistent with those of the

-27-

Commissioner and the Tax Court than those of M-PR. Those views are not binding on us, but they have some weight. Both sources tend to support the Commissioner's view that § 936(a) requires that the taxpayer itself actively conduct a trade or business, with the expectation being that this active conduct by the taxpayer would increase employment and investment in Puerto Rico. Both sources contemplate that the taxpayer be the party employing workers in the Puerto Rican economy.

Here, the Tax Court's conclusion, which was not clearly erroneous, was that M-PR's investment in Puerto Rico's economy was virtually nonexistent. MedChem, 116 T.C. at 337. M-PR's activities in Puerto Rico "failed even to qualify as a trade or business in Puerto Rico," id. at 338, much less as an actively conducted one. A-PR and M-USA directed and controlled "[a]ll of the business activities connected to Avitene." Id. Furthermore, during the relevant three-year period, M-PR placed only one employee in Puerto Rico. That employee, Mr. Perez, worked for M-PR out of a one-room office for less than one year of the requisite three-year period.

## 2. Western Hemisphere Trade Corporations

M-PR urges that we follow the construction that some courts have given to the phrase "active conduct of a trade or business" under the Western Hemisphere Trade Corporation ("WHTC") provisions of the Internal Revenue Code of 1954, § 921, 68A Stat. at 290, that were repealed in 1976. Section 921 defined "Western Hemisphere trade corporation" to mean "a domestic corporation all

of whose business . . . is done in any . . . countries in North, Central, or South America, or in the West Indies, and which satisfies" two requirements.  Id.  One requirement was that at least 95% of the corporation's gross income for the three preceding years be derived from sources outside of the United States.  Id. The other was that at least 90% of the corporation's gross income for the three preceding years be "derived from the active conduct of a trade or business."  Id.

Although at first cut the WHTC provision appears to be an apt point of comparison, ultimately this analogy does not assist M-PR.  This is primarily because of the important differences between the purposes of the WHTC provision and § 936.

Congress may, particularly in the internal revenue code, use the same phrase, such as "active conduct of a trade or business," in attempts to reach different ends.  The Supreme Court made this point in Commissioner v. Groetzinger, 480 U.S. 23 (1987). After noting that the phrase "trade or business" appeared in over fifty sections of the Code, the Court stated: "[I]n this opinion our interpretation of the phrase 'trade or business' is confined to the specific sections of the Code at issue here.  We do not purport to construe the phrase where it appears in other places."  Id. at 27 & n.8.  Other circuits construing the phrase "trade or business" have also concluded that the phrase has different meanings in different sections of the Internal Revenue Code.  In Hughes v. Commissioner, 38 F.2d 755 (10th Cir. 1930), for example, the Tenth Circuit, construing the statutory phrase "trade or business" in

-29-

section 204(a) of the Revenue Act of 1921, Pub. L. No. 67-98, § 204(a), 42 Stat. 227, 231 (1921), stated that "[w]e are here concerned only with the meaning of this phrase as used in this section. The same phrase, in other statutes, or in other sections, in a different context, and for a different purpose, may or may not be helpful." Hughes, 38 F.2d at 757. This is not to say that the WHTC provision is necessarily inapposite, but rather simply to emphasize, as we have emphasized in other contexts, that "the same words may play different roles in different contexts." Walker v. Exeter, 284 F.3d 42, 45 n.4 (1st Cir. 2002). The relevance of the WHTC provision, then, turns on its similarity to the provision at issue here.

The Tax Court has described the legislative history of the WHTC provision as disclosing a congressional "desire to offset through a tax preference the competitive disadvantage suffered by certain American corporations abroad on account of the less onerous taxes to which their non-American competitors were subject." Kewanee Oil Co. v. Comm'r, 62 T.C. 728, 737 (1974). Accordingly,

> [i]t follows that when the "active conduct" requirement is read in the context from which it arose, namely the threat of foreign competition, one might well conclude that in passing the Western Hemisphere provisions Congress intended to grant relief to United States business activity in the Americas only to the extent that the beneficiary corporation conducted active business operations abroad vulnerable to the competitive threat posed by the tax-advantaged corporations of other countries.

Id. at 737-38.

Like the WHTC provision, the possessions tax credit was meant to offset the competitive disadvantage suffered by American

-30-

companies. The possessions tax credit, however, was meant not only to offset certain impediments for U.S. corporations investing in Puerto Rico, but also to increase investment and employment-producing opportunities in Puerto Rico. This is a difference that makes a difference. To the extent that the WHTC provision was meant to increase the foreign competitiveness of domestic corporations, the geographic location of those corporations' operations was relevant only to a limited extent -- that is, it was important only to ensure that the domestic corporation actually engaged in some foreign commerce. In contrast, the possessions tax credit was meant, in addition to advancing the competitiveness of domestic corporations, to stimulate investment in particular places, including Puerto Rico. On this account, unlike the WHTC provision, the location of the corporation's trade or business was critical to advancing this goal. After all, the goal is promoting investment in the possessions -- a goal the attainment of which is intrinsically tied to the location of the investments made.

M-PR relies on <u>Frank</u> v. <u>International Canadian Corp.</u>, 308 F.2d 520 (9th Cir. 1962), a Ninth Circuit decision applying the WHTC provision of section 109 of the Internal Revenue Code of 1939. It is far from clear that this court would have viewed <u>Frank</u>'s facts the same way and reached the same outcome as did the Ninth Circuit, even under the WHTC.

In <u>Frank</u>, the Pennsylvania Salt Manufacturing Corporation of Washington, a domestic corporation that regularly conducted business activities in British Columbia, decided to assume new

-31-

shipping responsibilities. Id. at 522-23. For legitimate business reasons having to do with the most favored nation clauses in its contracts and the Robinson-Patman Act's prohibitions, Washington decided to form a new corporation, named International Canadian Corporation, as a WHTC, in order to perform the shipping. Id. International, in turn, had one full-time employee and assumed the parent's sales functions. Id. International did utilize services of Washington's employees and paid for those services. Id. at 523. The Ninth Circuit held, on review of a district court decision, that International, which came into existence for legitimate business reasons unrelated to the WHTC provision, was not disqualified from the WHTC credit although it had assumed former business of Washington, utilized and paid for help from Washington's employees, and did not have a source of supply or customers independent of Washington's. Id. at 526-27. The court found that International clearly was active, earning its income by performing a variety of services relating to the sale of chemical products. Id. at 525-27.

The Ninth Circuit's opinion is of limited utility because of the factual distinctions between it and the case here. For example, Frank found that International's existence was justified by a legitimate business purpose. Id. at 526. At least from early 1990, when M-USA had decided not to build a manufacturing plant in Puerto Rico, it is difficult to view M-PR as anything other than a corporate shell with little business reason to exist other than to attempt to secure the § 936 credit. Furthermore, as already

-32-

discussed, the divergent policy goals of the possessions tax credit and the WHTC provision mean that the analogy is strained from the start. Nothing in the history of the WHTC leads us to the taxpayer's interpretation.

**E.  Analogy to Other Regulatory Definitions**

The Tax Court found twenty-two uses of the phrase "active conduct of a trade or business" in the Internal Revenue Code. MedChem, 116 T.C. at 330 & n.13. M-PR argues that the Tax Court erred in looking by analogy to regulations interpreting "active conduct of a trade or business" as used in 26 U.S.C. §§ 179, 355, and 367, for purposes of interpreting the phrase as used in § 936.[11]

---

[11]  The sections selected by the Tax Court concern the following matters:

(1)   26 U.S.C. § 179 (2000).  Section 179 deals with the election to expense certain depreciable business assets.  It states, in part, that "[a] taxpayer may elect to treat the cost of any section 179 property as an expense which is not chargeable to capital account."  Id. § 179(a).  It defines "Section 179 property," for purposes of § 179, as "any tangible property (to which section 168 applies) which is section 1245 property (as defined in section 1245(a)(3)) and which is acquired by purchase for use in the <u>active conduct of a trade or business</u>."  Id. § 179(d)(1) (emphasis added).

(2)   26 U.S.C. § 355 (2000).  Section 355 deals with the distribution of stock and securities of a controlled corporation.  Section 355(a)'s provisions apply

>      only if either -- (A) the distributing corporation, and the controlled corporation . . . is engaged immediately after the distribution in the <u>active conduct of a trade or business</u>, or (B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the <u>active conduct of a trade or business</u>.

-33-

The argument is that the purposes of those sections are so different from the purpose of § 936 that their selection was arbitrary.

We do not think the selection was arbitrary. We analyze one example to demonstrate our point. M-PR says the regulation under § 179 is not analogous because that regulation is explicit: it refers to a trade or business "actively conducted <u>by the taxpayer</u>." 26 C.F.R. § 1.179-2(c)(6) (2001) (emphasis added). It states, in part, that "a taxpayer generally is considered to actively conduct a trade or business if the taxpayer meaningfully participates in the management or operations of the trade or business. A mere passive investor in a trade or business does not actively conduct the trade or business." <u>Id.</u> As stated earlier, our view is that the "by the taxpayer" requirement is implicit in § 936, and so the analogy to 26 C.F.R. § 1.179-2(c)(6) is not strained.

M-PR argues that the more appropriate analogy is to 26 U.S.C. § 936(h)(5), and guidance provided thereunder, which, M-PR

---

<u>Id.</u> § 355(b)(1) (emphases added).

(3) 26 U.S.C. § 367 (2000). Section 367 deals with foreign corporations. It provides that, if in connection with certain defined exchanges, United States persons transfer property to foreign corporations, "such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation." <u>Id.</u> § 367(a)(1). But, in general, § 367(a)(1) does "not apply to any property transferred to a foreign corporation for use by such foreign corporation in the <u>active conduct of a trade or business</u> outside of the United States." <u>Id.</u> § 367(a)(3)(A) (emphasis added).

-34-

says, contemplates the use of contract manufacturers. That section states, in relevant part, that

> an electing corporation shall not be treated as having a significant business presence in a possession with respect to a product produced in whole or in part by the electing corporation in the possession . . . unless such product is manufactured or produced in the possession by the electing corporation within the meaning of subsection (d)(1)(A) of section 954.

26 U.S.C. § 936(h)(5). Section 954(d)(1)(A) states that

> the term "foreign base company sales income" means income . . . derived in connection with the purchase of personal property from a related person and its sale to any person, the sale of personal property to any person on behalf of a related person, the purchase of personal property from any person and its sale to a related person, or the purchase of personal property from any person on behalf of a related person where -- (A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized.

26 U.S.C. § 954(d)(1) (2000). M-PR says that it relied on a Revenue Ruling concluding that, under § 954, when a "controlled foreign corporation" contracts out a manufacturing process to another manufacturer, the contract manufacturer's performance is considered to be performance by the controlled foreign corporation. See Rev. Rul. 75-7, 1975-1 C.B. 244. M-PR says § 936(a)(2) must be read, in light of Revenue Ruling 75-7, not to require the taxpayer actually to supervise the contract manufacturer's activities.

The two sections, however, measure different things. As the Commissioner points out, the Revenue Ruling allows contract manufacturing to be taken into account in narrow situations, not present here. Section 936(h)(1) taxes "intangible property income"

-35-

to the U.S. shareholder of the § 936 corporation unless the § 936 corporation elects either the cost sharing or profit split method. See 26 U.S.C. § 936(h)(5)(C). To make that election, the § 936 corporation must have a "significant business presence" ("SBP") in the possession as to that product or service. In order to show a "significant business presence" certain numerical tests must be met and, in addition, the product must be manufactured or produced in the possession within the meaning of § 954(d)(1)(A). For these stated purposes, contract manufacturing costs may be attributed to the taxpayer as allowed by the regulations. Those regulations, for purposes of the SBP requirement, permit a possessions corporation to treat the cost of contract manufacturing as a cost of direct labor. See 26 C.F.R. § 1.936-5(c). The purpose appears to be to permit a taxpayer who has already satisfied the 75% "active conduct of a trade or business" requirement then to obtain § 936 credit for the contract manufactured product. We reject the argument that the section 936(h)(5) provisions govern by analogy the initial question of what is meant by the active conduct of a trade or business.[12]

## F. Application of Section 936(a) to the Facts

Under our understanding of the statutory term, the requisite gross income of M-PR, over the relevant three-year time

---

[12] The taxpayer relies on cases arising under other provisions of the Internal Revenue Code, which hold that a taxpayer need not manufacture its own product but may be a manufacturer by use of a contract manufacturer. See Suzy's Zoo v. Comm'r, 273 F.3d 875, 879 (9th Cir. 2001); Polaroid Corp. v. United States, 235 F.2d 276, 278 (1st Cir. 1956). Those cases address different problems. One size does not fit all.

period, was not "derived from the active conduct of a trade or business within a possession of the United States." 26 U.S.C. § 936(a)(2)(B). This is because M-PR was not engaged in the active conduct of a trade or business in Puerto Rico for the three preceding years. The Tax Court was "not even able to find that MedChem P.R. had any meaningful business activity in Puerto Rico." MedChem, 116 T.C. at 337. We agree that, whatever M-PR's presence in Puerto Rico, over the relevant time-period, it did not actively conduct a trade or business there. A-PR and M-USA, but not M-PR, directed and controlled all of the Avitene business activities. A-PR performed the tasks required in the manufacturing process, without the ability of M-PR to control any part of that process.

During much of the relevant three-year period, M-PR had no employees. Its one employee, Mr. Perez, was a former A-PR employee who worked out of a one-room office maintained by M-PR. He worked for M-PR from March 1988 to June 1990, though only about ten months of his employment occurred during the relevant three-year period. M-PR argues that, for other reasons, A-PR activities must be attributed to M-PR, and that A-PR employees are M-PR's employees. The Tax Court adopted as its definition of an employee of M-PR the definition used by the IRS to determine if an individual is an employee for payroll tax and withholding purposes. See MedChem, 116 T.C. at 341-43 (citing 26 C.F.R. § 31.3401(c)-1(b) (stating, among other things, that "if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for

-37-

accomplishing the result, he is not an employee")). Under that approach, neither A-PR nor the contract employees meet the test. Nor do those M-USA employees who served as M-PR officers but received no compensation from M-PR. We think the Tax Court's approach was correct because we agree that none of the purported M-PR employees were subject to M-PR's control as to the means and methods of carrying out the production and sale of Avitene. Even were this not the case, we also think it significant that, until this litigation, M-PR consistently treated these individuals as nonemployees for tax purposes.

Finally, M-PR makes a policy argument that it should be within the scope of the tax credit because it created jobs in the sense that it could have chosen earlier to move the Avitene production process out of Puerto Rico. Had it done so, there would have been a net job loss. But avoiding the destruction of jobs is not the same as creating new job opportunities, which was part of Congress's concern. It would seem contrary to congressional intent to create incentives for American companies to threaten the loss of contract manufacturing jobs in Puerto Rico unless the American companies were given the possessions tax credit. More significantly, M-PR's argument is too broad. All investment, of whatever nature, in Puerto Rico may be thought to contribute to job producing opportunities. But Congress did not intend the credit to apply whatever the nature of the investment. Congress limited the credit to those involved in the "active conduct of a trade or business." And that does not describe what the taxpayer here did.

## G. Conclusion

We have no basis, in the statute or on the facts, to upset the Tax Court's reasonable conclusion that the taxpayers owe the deficiency assessed. This case has not required us to evaluate the Tax Court's proposed rule; each case will bring factual variations, which bring with them legal consequences.

We affirm the judgment of the Tax Court.